## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

Michael B.,

             Plaintiff,

v.

Commissioner of Social Security,

             Defendant.

Civil No. 3:24-cv-01541-TOF

September 17, 2025

## RULING ON PENDING MOTIONS

The Plaintiff, Michael B.,[1] appeals the decision of the Commissioner of Social Security ("Commissioner" or "Defendant") rejecting his application for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act.  (Compl., ECF No. 1.)  He has moved the Court for an order reversing or remanding the decision of the Administrative Law Judge, or "ALJ."  (ECF No. 17.)  The Commissioner has moved the Court to affirm.  (ECF No. 23.)

The Plaintiff makes a single claim of error: that the ALJ erred in evaluating the opinions of his therapist, Licensed Professional Counselor Emily Waller, "leaving the decision non-compliant with regulation and without the support of substantial evidence."  (*See* Pl.'s Memo. of L., ECF No. 17-1, at 8-14) ("Pl.'s Memo.").  Having carefully reviewed the parties' briefs and the entire, 1,462-page administrative record, the Court disagrees.  The Plaintiff's motion will therefore be denied, the Commissioner's will be granted, and judgment will enter in the Commissioner's favor.

---

[1]    Pursuant to the Court's January 8, 2021 Standing Order, the Plaintiff will be identified solely by first name and last initial, or as "Plaintiff," throughout this opinion.  *See* Standing Order Re: Social Security Cases, No. CTAO-21-01 (D. Conn. Jan. 8, 2021).

I.     FACTUAL AND PROCEDURAL BACKGROUND

A.     The Plaintiff and His Medical/Mental Condition

The Plaintiff is a now 48-year-old man who lives in the Riverside section of Greenwich, Connecticut.  (R. 171.)  He formerly worked as an attorney, but he left the practice of law in 2010.  (R. 197.)  He and his wife had two children later that decade, and after they were born, he stayed home to care for them.  (R. 44, 295.)

In September of 2022 the Plaintiff's wife suddenly left him, taking their children with her.  (R. 295.)  She left without advance warning and without taking anything out of the family home, and the Plaintiff did not immediately piece together what had happened.  (*See* R. 44.)  He "called the police . . . frantically searching for" his wife and children, because he had "no idea where they were."  (*Id.*)  Ultimately he figured out that his wife was seeking to end their marriage, and he filed for divorce nine days later.  (*Id.*)  After he filed suit, "she show[ed] up, but claiming abuse and all sorts of other things which were not true."  (*Id.*)

The Plaintiff says that this chain of events led to a "downward spiral" in his mental health.  (*Id.*)  Between September and December he became increasingly despondent about his situation, and he "research[ed] ways to commit suicide."  (R. 295.)  His mother brought him to Stamford Hospital on December 1, 2022 (R. 341), where he was admitted for inpatient psychiatric treatment early the next morning.  (R. 357, 363.)  His doctors assessed him as suffering from bipolar disorder with depression.  (R. 362.)

After five days in the hospital, the Plaintiff "appear[ed] to have returned to baseline."  (R. 268.)  He stated that he was no longer experiencing the suicidal ideations that he had reported upon admission.  (*Id.*)  A Stamford Hospital doctor "psychiatrically cleared [him] for discharge" on

December 7, 2022 (R. 267), and the hospital referred him to intensive outpatient treatment ("IOP") at St. Vincent's Medical Center in Norwalk.  (R. 268.)

The Plaintiff attended IOP at St. Vincent's beginning in mid-December, 2022.  (R. 474-771.)  His outpatient treatment program began with two initial assessments on December 14, 2022 – one by a psychiatrist, Dr. Mikhail Magid (R. 779), and another by a licensed professional counselor ("LPC") named Hannah Lobell Garrett.  (R. 481.)  During his evaluation with LPC Garrett, the Plaintiff reported that "his mood ha[d] been more stable" and his "sleep and appetite ha[d] returned" since his discharge from Stamford Hospital.  (R. 479.)  LPC Garrett noted that he would be "starting in the evening IOP program on 12/19/2022 and will attend Mondays, Wednesdays, and Thursdays."  (*Id.*)

The Plaintiff then attended group therapy sessions on thirteen different dates between December 19, 2022 and February 1, 2023.  (R. 486, 510, 526, 554, 578, 602, 624, 646, 667, 689, 710, 731, 752.)  Four different clinicians presided over at least one session:  LPC Elizabeth Atkin, LPC Emily Waller, LPC Jennifer Brown, and Licensed Clinical Social Worker ("LCSW") Dana Valentine Tufiarello.  (*Id.*)  The size of the groups ranged from four to nine participants.  (R. 667, 689.)  On February 1, 2023 – his IOP graduation date – the Plaintiff exhibited normal speech, appropriate appearance, stable mood, full orientation, and intact cognition.  (R. 759-60.)  He stated that his experience in IOP had been "very positive."  (R. 759.)

After graduating from IOP, the Plaintiff continued to see his outpatient psychiatrist, Dr. Magid.  (*E.g.*, R. 779.)  On February 13, 2023, the doctor recorded that the Plaintiff "appear[ed] to be having residual symptoms of mood disorder," but was then "demonstrat[ing] minimal side effects of treatment" and "tolerat[ing] treatment well."  (R. 780.)  He continued the Plaintiff on the same treatment and medications.  (*Id.*)  After a March 24, 2023 visit, the doctor entered a similar

report.  (R. 1089.)  At an April 17, 2023 visit, however, the Plaintiff disclosed that he had stopped taking some of his medications.  (R. 1215.)  Because he was still "exhibit[ing] residual symptoms of depression with elements of hopelessness, anxiety, and anhedonia," Dr. Magid recommended that he return to IOP.  (*Id.*; *see also* R. 1420 (stating that Plaintiff "was referred back to IOP . . . due to an exacerbation of symptoms"); R. 45 (Plaintiff's testimony that he "had to go back to the IOP program because [he] was not doing well").)

The Plaintiff then attended seven IOP sessions between April 20 and May 17 of 2023.  (R. 1225, 1238, 1256, 1283, 1304, 1322, 1330, 1358.)  After completing IOP for the second time, he "transferred back to a once-a-week outpatient group[.]"  (R. 1420; *see also* R. 1376, 1382, 1387, 1397, 1408.)  During this post-IOP period, the Plaintiff's medical providers added post-traumatic stress disorder ("PTSD") and generalized anxiety disorder to his "problem list."  (R. 1397) (recording that PTSD was "noted" on June 20, 2023 and generalized anxiety disorder on August 2, 2023).

The Plaintiff also treated with Katherine Salib, a Licensed Master Social Worker ("LMSW") who was not affiliated with St. Vincent's.  (R. 1454-58.)  LMSW Salib saw the Plaintiff at five individual therapy sessions between June 23 and August 10, 2023.  (*Id.*)  At the time of his benefits hearing before the ALJ, the Plaintiff stated that his treatment consisted of individual therapy with LMSW Salib, and once-a-week group therapy at St. Vincent's.  (R. 45.)

**B.    The Plaintiff's Supplemental Security Income Claim**

The Plaintiff applied for SSI benefits on January 25, 2023 (R. 60), midway through his initial course of IOP treatment.  He claimed that he was limited in his ability to work by "bipolar [disorder]" and "anxiety."  (R. 188.)  In a questionnaire that he filled out shortly after his initial application, he reported "mood swings from elation to depression," "suicidal thoughts," an

inability to pay attention for more than two minutes, and "difficult[y]" with bathing and dressing. (R. 204-11.)  He appointed an attorney as his representative before his initial application (*see* R. 78), and thus he was represented by counsel at the initial, reconsideration, and agency hearing levels of the benefit determination process.

At the initial level, the Social Security Administration ("SSA") obtained a record review from a psychologist named Christopher Leveille.  (R. 63.)  Dr. Leveille noted the Plaintiff's bipolar disorder assessment, but he also noted that there was "no clinical/supporting evidence of this [with] no history of manic episodes on file."[2]  (*Id.*)  Furthermore, the doctor observed that the Plaintiff was "stable emotionally" as early as December 7, 2022, the date on which he was discharged from Stamford Hospital.  (*Id.*)  Dr. Leveille concluded that, because "[t]reatment notes document[ed] trending improvement with intact mental status functions [and] stable mood," a return to normal status "is appropriately anticipated by 12 months."  (*Id.*)  An SSA examiner then denied the Plaintiff's benefits claim at the initial level.  (R. 66.)

The Plaintiff requested reconsideration (R. 88), and a second psychologist, Kelly Rogers, reviewed his medical information on behalf of the SSA.  (R. 71.)  Dr. Rogers noted "some psychotic [symptoms]" in the Stamford Hospital records, but added that "these have not persisted in outpatient care."  (*Id.*)  She further observed that the Plaintiff's "[m]ood concerns have largely responded to treatment," although he still had "some residual anxiety."  (*Id.*)  In contrast to Dr. Leveille, who had noted mild limitations in only two of the four principal domains of mental

---

[2]      Bipolar disorder "is a mental health condition that causes extreme mood swings."  Mayo Clinic, *Diseases and Conditions: Bipolar Disorder*, https://www.mayoclinic.org/diseases-conditions/bipolar-disorder/symptoms-causes/syc-20355955 [https://perma.cc/3A9A-YGS7] (last visited Sept. 14, 2025).  "These include emotional highs, also known as mania or hypomania, and lows, also known as depression."  *Id.*  In substance, Dr. Leveille observed evidence of "lows" but not "highs" in the Plaintiff's medical record.

functioning (R. 63), Dr. Rogers noted mild limitations in three.  (R. 70.)  But she did not observe marked or extreme limitations in any domain.  (*Id.*)  She opined that the Plaintiff "remains able to perform detailed, non-speeded work for periods of two hours or more over the course of a normal work week," and that he could "accommodate minor, but not frequent or major changes in work routine."  (R. 72-73.)  After reviewing this information, a different SSA examiner denied the Plaintiff's claim at the reconsideration level.  (R. 67.)

The Plaintiff then requested a hearing before an ALJ (R. 91), and ALJ Randolph Alden held a telephonic hearing on September 6, 2023.  (R. 36, 38.)  In response to questions from the ALJ, the Plaintiff testified to the "downward spiral" that followed his wife's sudden departure, and to the "extreme distress" and "physical reactions" that it produced.  (R. 44.)  He described his course of therapy and his medication regimen, and he stated that they were "helpful to a point[;]" while his symptoms were no longer "as extreme . . . as they were," and no longer included suicidal ideation, "the underlying symptoms are still there."  (R. 45-47.)  He recounted how he tried to work as a family law attorney, but quit after two days because he "would get confused as to what documents [he] had to print out" and "angry at [him]self that [he] couldn't do something so simple."  (R. 48.)  The ALJ then asked him several questions about his activities of daily living (R. 49-52), and then passed him to his then-attorney, who asked five additional questions.  (R. 52-53.)

The ALJ then turned to a vocational expert ("VE"), Courtney Olds.  (R. 53.)  The VE testified that, if the Plaintiff's mental impairments limited him to work that involved only simple instructions and only occasional interactions with co-workers, he could not perform his past relevant work as an attorney.  (R. 55.)  But the VE then testified that there were other jobs available in the national economy that a person with such limitations could perform, including housekeeper,

laundry worker, and night cleaner.  (R. 55-56.)  The VE added that these jobs would be available to such a person even if he or she could never interact with the public, and could never be expected to perform "tandem or group tasks" or "work that requires . . . fast-paced assembly line or strictly monitored daily production quota requirements."  (R. 56.)  The Plaintiff's attorney then asked the VE one question – whether a person who "walked off the workstation . . . at least two times a month . . . would . . . be able to keep a job."  (R. 57.)  The VE answered that he would not, and the attorney asked no other questions.  (R. 57-58.)  The hearing closed with the ALJ agreeing to keep the record open so that counsel could submit additional records.  (R. 58.)

The next day, the Plaintiff's counsel submitted two documents from LPC Waller that form the principal bases for this appeal.  The first was a three-page letter dated September 7, 2023 that began with a recounting of the Plaintiff's treatment at St. Vincent's "for symptoms consistent with Bipolar Disorder, Post Traumatic Stress Disorder, and Generalized Anxiety Disorder."  (R. 1420.) LPC Waller then listed the symptoms that the Plaintiff still claimed to experience, including "anhedonia, "difficulty getting out of bed," "lack of motivation," "depressed mood," "anxiety," "anxiety/panic attacks," "flashbacks," "nightmares," "avoidance behaviors," "intrusive thoughts/memories," "dissociation," "feeling distant/cut off from others," "sleep disturbances," "memory problems," "difficulty focusing/inability to concentrate," and "lethargy."  (R. 1421.)  She opined that, "[d]ue to the severity of his symptoms it is likely that [the Plaintiff] will require to be absent frequently," with "[m]ore than one absence per month" being "highly likely."  (*Id.*)  She stated that this conclusion was "evidenced by the significant difficulty with focus and concentration exhibited during IOP and OP group settings."  (*Id.*)  In those settings, the Plaintiff sometimes showed "a need to have instructions or directions restated," and he had "difficulty with problem solving and often require[d] the assistance of the group leader."  (*Id.*)  He also "struggle[d]

to engage in and maintain appropriate social interactions due to intensity of emotions and ongoing difficulty with regulating emotions or tolerating distress." (*Id.*) LPC Waller added that the Plaintiff "has difficulty managing conflicts and views that differ from his own, which could be very problematic in a work setting with co-workers." (*Id.*)

The second document was a four-page "emotional impairment questionnaire" that had been sent to LPC Waller by the Plaintiff's attorney. (R. 1423-26.) In that document, LPC Waller rated the overall severity of the Plaintiff's symptoms as "marked," which the questionnaire defined as a "seriously limited" "ability to function in this area," "resulting in at least occasional (33.3%) failure to function" – a definition that the Plaintiff's counsel substantially borrowed from SSA regulations. (R. 1423-24); *see also* 20 C.F.R. § 416.902(h). Breaking things down further, LPC Waller also rated the Plaintiff as having "marked" limitations in two of the four major domains of mental functioning – "ability to understand, remember, or apply information," and "ability to interact with others." (R. 1425.) She again cited his difficulty with instructions and his "struggles with handling conflicts." (*Id.*) In the case of "interact[ing] with others," however, she qualified her rating by saying that it was "based on how patient presents and interacts with others in a mental health group therapy session." (*Id.*)

The ALJ issued an unfavorable decision seven weeks later, on October 27, 2023. (R. 31.) As will be discussed below, ALJs must follow a five-step process in determining eligibility for SSI benefits, and the ALJ's fourteen-page decision followed that format. (R. 18-31.) At Step One, he held that the Plaintiff had "not engaged in substantial gainful activity since January 25, 2023," the date on which he applied for SSI benefits. (R. 20.) At Step Two, the ALJ concluded that the Plaintiff's "bipolar depression and post-traumatic stress disorder" constituted "severe

impairments," because they "significantly limit the ability to perform basic work activities[.]"[3] (*Id.*)  At Step Three, he held that the Plaintiff's impairments did not meet or medically equal any of the "Listings" – that is, the impairments listed in Appendix 1 to 20 C.F.R. Part 404, Subpart P. (R. 21.)  He considered Listings 12.04 ("depressive, bipolar and related disorders") and 12.15 ("trauma- and stressor-related disorders"), but determined that they had not been satisfied.  He assessed the Plaintiff as having moderate limitations in the four domains of mental functioning (R. 21-22); in other words, he found the Plaintiff to be more limited in these areas than Drs. Leveille or Rogers had.  (*Compare* R. 21-22 *with* R. 63, 70.)  But "[b]ecause the claimant's mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation," and because the so-called "Paragraph C' criteria had not been satisfied, he concluded that the Plaintiff's impairments did not meet or medically equal either Listing.  (R. 21-23.)

The ALJ then determined the Plaintiff's residual functional capacity, or "RFC."  (R. 23.) He wrote that the Plaintiff possessed the RFC:

> [T]o perform a full range of work at all exertional levels but with the following nonexertional limitations:  the claimant can understand, remember, and carry out simple instructions, the claimant can never interact with the general public, the claimant can occasionally interact with co-workers, but with no tandem or group tasks required, the claimant can occasionally interact with supervisors, the claimant can perform work that requires no fast-paced assembly line nor strictly-monitored daily production quota requirements, and the claimant can adapt to occasional workplace changes.

(R. 23.)  In reaching this conclusion, he reviewed the opinion evidence from Drs. Leveille and Rogers.  He found the Leveille opinion to be persuasive, in part because it was supported by the medical evidence that was in the record at the time of the doctor's review.  (R. 27.)  He found the Rogers opinion to be "not persuasive" because, although the doctor's severity ratings in the four

---

[3]    The Plaintiff's medical record documented obesity and dermatitis.  (R. 20.) The ALJ found these conditions to be medically-determinable but non-severe.  (*Id.*)  The Plaintiff does not challenge that finding on appeal.  (*See generally* Pl.'s Memo.)

domains of mental functioning were "consistent with the medical evidence of record," her efforts to translate them into specific vocational terms were "not programmatically correct." (*Id.*) The ALJ wrote that "[a] limit to 'minor, but not frequent or major changes in work routine' is not vocationally relevant." (*Id.*) "Instead, vocationally relevant terms would include 'none, occasionally, frequent, constant, or unlimited." (*Id.*)

In determining the Plaintiff's RFC, the ALJ also considered the two opinions from LPC Waller. (R. 28-29.) LPC Waller had opined that the Plaintiff suffered from a marked limitation in his ability to understand, remember, and carry out instructions (R. 1425), but the ALJ found that "this opinion does not appear to be supported by the medical evidence of record." (R. 29.) He observed that "[t]here are limited treatment records here and this opinion is also partially based on the [Plaintiff's] report made to the group therapist that he was regularly attending individual therapy sessions which does not appear to be the case." (*Id.*) He stated that the Plaintiff had "only attended a total of five individual therapy sessions." (*Id.*) (citing reports from LMSW Salib). As will be shown, the Plaintiff challenges this conclusion on factual grounds in this appeal.

The ALJ also considered LPC Waller's assessment of a marked limitation in the domain of interacting with others. (*Id.*) He acknowledged that the Plaintiff had "difficulty" interacting with others during his group therapy sessions, but he observed no evidence of similar struggles outside the group setting. (*Id.*) He therefore concluded that an RFC limitation to "simple tasks . . . with no tandem or group tasks required" would be a sufficient response to LPC Waller's observations. (*Id.*)

The ALJ found the Waller opinions persuasive to the extent that they counseled more than the "mild" limitations that Drs. Leveille and Rogers had observed. (*Id.*) ("[T]he evidence here noted supports greater than a mild rating[.]"). But he also noted that, under the SSA's regime for

10

assessing severity, the distance between "mild" and "marked" is "broad." (*See id.*) ("[U]nder agency policy, a moderate rating represents a broad spectrum of functioning between 'mild' and 'marked[.]'") He concluded that the record evidence supported moderate ratings and RFC limitations on complex instructions and group tasks, but not the marked limitations claimed by LPC Waller. (*Id.*)

After determining the Plaintiff's RFC, the ALJ proceeded to Step Four. (R. 30.) He concluded that the Plaintiff's limitations would not permit him to return to his past relevant work as an attorney. (*Id.*) But at Step Five, he held that the Plaintiff could perform the jobs of housekeeper, laundry worker, and night cleaner, and that those jobs "exist[] in significant numbers in the national economy." (R. 30-31.) He therefore ruled that the Plaintiff "has not been under a disability, as defined in the Social Security Act, since January 25, 2023, the date the application was filed[.]" (R. 31.)

The Plaintiff requested review (R. 169), but the Appeals Council "found no reason under [the SSA's] rules to review the Administrative Law Judge's decision." (R. 1.) It therefore denied his request, making the ALJ's decision "the final decision of the Commissioner of Social Security in [his] case." (*Id.*)

The Plaintiff timely filed suit in this Court (Compl., ECF No. 1), and the Commissioner answered by filing the certified administrative record. (ECF No. 12); *see also* Supp. R. for Soc. Sec. 4(b) ("An answer may be limited to a certified copy of the administrative record[.]"). The parties consented to the jurisdiction of the undersigned Magistrate Judge. (ECF Nos. 5, 10.) The Plaintiff then filed his motion to reverse or remand the Commissioner's decision (ECF No. 17), and the Commissioner filed a motion to affirm. (ECF No. 23.) The Plaintiff did not file a reply brief, although in his "notice of no reply," he argued that the Commissioner had failed to respond

to several of his contentions. (ECF No. 24.) Neither party requested oral argument, and accordingly the motions are ripe for decision.

## II.    APPLICABLE LEGAL PRINCIPLES

To be considered disabled under the Social Security Act, a claimant must establish that he is "unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.'" *Rubin v. O'Malley*, 116 F.4th 145, 147 (2d Cir. 2024) (quoting 42 U.S.C. § 423(d)(1)(A)). To determine whether a claimant is disabled, the ALJ follows a familiar five-step evaluation process.

At Step One, the ALJ determines "whether the claimant is currently engaged in substantial gainful activity . . . ." *McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008)). At Step Two, the ALJ analyzes "whether the claimant has a severe impairment or combination of impairments . . . ." *Id.* At Step Three, the ALJ then evaluates whether the claimant's disability "meets or equals the severity" of one of the Listings. *Id.* At Step Four, the ALJ uses an RFC assessment to determine whether the claimant can perform any of his "past relevant work." *Id.* At Step Five, the ALJ addresses "whether there are significant numbers of jobs in the national economy that the claimant can perform given the claimant's [RFC], age, education, and work experience." *Id.* The claimant bears the burden of proving his case at Steps One through Four. *Id.* At Step Five, "the burden shift[s] to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012) (per curiam).

In reviewing a final decision of the Commissioner, this Court "perform[s] an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). Its role is to determine

whether the Commissioner's decision is supported by substantial evidence and free from legal error. "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

A disability determination is supported by substantial evidence if a "reasonable mind" could look at the record and make the same determination as the Commissioner. *See Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (defining substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (citations omitted). Although the standard is deferential, "[s]ubstantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009) (internal quotation marks and citations omitted). When the decision is supported by substantial evidence, the Court defers to the Commissioner's judgment. *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, [this Court] will not substitute [its] judgment for that of the Commissioner.").

An ALJ does not receive the same deference if he has made a material legal error. In other words, district courts do not defer to the Commissioner's decision "[w]here an error of law has been made that might have affected the disposition of the case[.]" *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." *Ellington v. Astrue*, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

## III.    DISCUSSION

As noted in the introduction, the Plaintiff asserts a single claim of error: he argues that the ALJ "erred in his evaluation of Ms. Waller's opinions, leaving the decision non-compliant with the regulation and without the support of substantial evidence." (Pl.'s Memo. at 8.) The Commissioner disagrees, arguing in response that "[t]he ALJ reasonably found Ms. Waller's opinion [only] somewhat persuasive because it was not well supported or consistent with the other evidence." (Memo. in Supp. of Def.'s Mot. for Order Affirming the Comm'r's Decision, ECF No. 23-1, at 8) ("Def.'s Memo.").

The legal principles governing this dispute are relatively new, but nevertheless well established. For disability claims filed on or after March 27, 2017, the SSA has changed how ALJs are to assess medical opinions from treating sources. Before that date, the agency "recognize[d] a 'treating physician' rule of deference to the views of the physician who has engaged in the primary treatment of the claimant." *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir 2003). "According to this rule, the opinion of the Plaintiff's treating physician as to the nature and severity of the impairments [was] given 'controlling weight' so long as it '[was] well supported by medically acceptable clinical and laboratory diagnostic techniques and [was] not inconsistent with the other substantial evidence in the case record.'" *Poole v. Saul*, No. 3:19-cv-927 (SALM), 2020 WL 2611230, at *5 (D. Conn. May 22, 2020) (quoting *Burgess*, 537 F.3d at 128). Effective March 27, 2017, however, "the [SSA] promulgated the regulations now found at 20 C.F.R. §§ 404.1520c and 416.920c[.]" *Schillo v. Kijakazi*, 31 F.4th 64, 71 n.1 (2d Cir. 2022). In cases filed after that date, "the new regulations no longer apply the treating physician rule." *Id.*; *see also* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844, 5853 (S.S.A. Jan. 18, 2017); 20 C.F.R. §§ 404.1520c, 416.920c (stating that, from March 27, 2017

14

onward, the SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . including those from [the claimant's] medical sources").

The new regulations changed more than the degree of deference that an ALJ must show to a treating physician's opinion; they also changed how an ALJ must explain himself in his written decision. Under the old rules, an ALJ could decline to give controlling weight to a treating doctor's opinion if it was "not well supported by medically acceptable clinical and laboratory diagnostic techniques" or was "inconsistent with the other substantial evidence in the case record." *Louise D. v. O'Malley*, No. 3:22-cv-1465 (MPS) (TOF), 2024 WL 1478075, at *6 (D. Conn. Feb. 29, 2024) (citation and quotation marks omitted), *report and recommendation accepted and adopted*, slip op. (D. Conn. Mar. 18, 2024). But if he did so, Second Circuit case law required him to "'explicitly' consider at least four factors" – "(1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Id.* at *7 (quoting *Estrella v. Berryhill*, 925 F.3d 90, 95-96 (2d Cir. 2019)). If the ALJ failed to discuss any of these four factors in his written decision, and if he failed to "otherwise provide[] good reasons for [his] weight assignment," his decision was subject to reversal unless "a searching review of the record" revealed "that the substance of the treating physician rule was not traversed[.]" *Estrella*, 925 F.3d at 96 (citation and quotation marks omitted).

The new regulations oblige the ALJ to consider at least five factors when analyzing medical opinions, but they impose a duty of explanation only with respect to two. "When determining the persuasiveness of a given medical opinion, ALJs must consider its supportability; its consistency; the length of the source's treating relationship with the claimant, including the frequency of examinations and the purpose and extent of the relationship; the specialization of the source; and

'other factors that tend to support or contradict a medical opinion.'" *Sheila Renee H. v. Kijakazi*, No. 3:21-cv-944 (TOF), 2022 WL 4181723, at *11 (D. Conn. Sept. 13, 2022) (quoting 20 C.F.R. § 416.920c(c)); *see also* 20 C.F.R. § 404.1520c(c). "In his written decision, the ALJ must explicitly articulate how he considered the supportability and consistency factors." *Id.* (citing 20 C.F.R. § 404.1520c(b)(2)). "He may, but is not required to, explain how he considered the other factors." *Id.* (citing 20 C.F.R. § 404.1520c(b)(2)); *see also Tiffany T. v. Comm'r of Soc. Sec.*, No. 3:22-cv-626 (VAB) (TOF), 2023 WL 10949091, at *10 (D. Conn. Sept. 1, 2023) (rejecting claimant's argument about the treatment of a medical opinion because it "conflate[d] the duty to consider and the duty to explain"), *report and recommendation approved and adopted*, 2024 WL 1230256 (D. Conn. Mar. 22, 2024).

In this case, the ALJ adequately discussed the supportability of the Waller opinions. The "supportability" analysis "compare[s] the source's opinion with the source's own medical findings." *Joseph L. v. Kijakazi*, No. 3:22-cv-183 (TOF), 2023 WL 1432630, at *4 (D. Conn. Feb. 1, 2023). The ALJ accurately noted that "[t]here are limited treatment records here" (R. 29), and that LPC Waller had only observed the Plaintiff in a group setting. (R. 28-29.) And in part because LPC Waller had seen the Plaintiff only in that setting, her treatment notes lacked any evidence that he "would have difficulty in performing simple tasks and with no tandem or group tasks required[.]" (R. 29; *cf. also* R. 498 ("encounter note" by LPC Waller, noting that the Plaintiff had been "cooperative and engaged throughout group session" on December 19, 2022); R. 511 (describing Plaintiff's behavior at December 20, 2022 group therapy session in positive terms); R. 579 (noting that Plaintiff was "cooperative and engaged" on December 28, 2022); R. 604 (describing Plaintiff's behavior on January 3, 2023 in positive terms); R. 633 (noting that Plaintiff was "cooperative and engaged" on January 4, 2023, and had "shared openly with the group about

his 'high-conflict' divorce"); R. 668 (noting that Plaintiff "[d]emonstrated understanding," "[g]ave feedback appropriately" and was "receptive" at his group therapy session on January 17, 2023); R. 690 (observing same behaviors on January 18, 2023); R. 711 (observing same behaviors on January 26, 2023); R. 739 (stating that Plaintiff "was an active participant throughout group session" on January 30, 2023); R. 753 (noting that Plaintiff accepted and gave feedback "appropriately" on February 1, 2023).)  In short, the ALJ sufficiently explained why he thought LPC Waller's opinions were not fully supported by her own notes and treatment records, and that explanation is supported by substantial evidence.

The ALJ's discussion of the consistency of the Waller opinions was likewise sufficient. Whereas the supportability analysis compares the opining source's opinion with her own findings and records, the consistency analysis "measures how 'consistent a medical opinion[] . . . is with the evidence from other medical sources and nonmedical sources." *Joseph L.*, 2023 WL 1432630, at *5 (quoting 20 C.F.R. § 404.1520c(c)(2)); *see also* 20 C.F.R. § 416.920c(c)(2).  In this case, the ALJ noted that the Plaintiff's larger mental health record repeatedly reflected "intact cognition and/or memory, relevant thoughts, and/or goal-directed, linear, concrete and logical thought processes."  (R. 21 (citing forty-two instances in the record); *see also* R. 29 (referring the reader to "the mental status findings and records discussed above" and citing the same instances in the record).)  He also noted multiple instances in which the record documented "stable, unremarkable, euthymic, or calm mood or mood within normal limits, normal or clear speech, full affect or an affect within normal limits, normal psychomotor activity, and/or engage[ment] throughout the group session."  (R. 21) (citing forty-two instances).  And the ALJ also observed twenty different occasions in which the record documented the Plaintiff's "ability to relate," "g[i]ve and/or accept[] feedback appropriately," "listen[] attentively to others," "and/or demonstrate[] understanding."

(R. 21-22.)   Because the ALJ adequately addressed the supportability and consistency of the Waller opinions, and because his discussion was supported by substantial evidence, his conclusions are entitled to deference from this Court.  *See Sheila Renee H.*, 2022 WL 4181723, at *11 ("Provided that the ALJ follows these legal principles, and further provided that his decisions are supported by substantial evidence, his treatment of a given medical opinion is entitled to deference from the Court.").

The Plaintiff nonetheless observes several faults with the ALJ's treatment of the Waller opinions, but none of these alleged faults provide a reason to withhold this deference.  The Plaintiff first argues that the ALJ was factually mistaken about the number of individual therapy sessions he attended.  (Pl.'s Memo. at 9-10.)  The ALJ had noted that LPC Waller's  opinion was based in part on the Plaintiff's report "that he was regularly attending individual therapy," and he concluded that this statement "does not appear to be the case" because the Plaintiff "has only attended five individual therapy sessions."  (R. 29) (citing notes of LMSW Salib, with whom Plaintiff treated on five occasions).  On appeal, the Plaintiff points out that after six of his visits with Dr. Magid, the doctor included a two-word notation that "psychotherapy" had been "provided."  (Pl.'s Memo. at 9-10.)  He therefore reasons that he had eleven individual therapy sessions, not five, and that the ALJ committed reversible error in using the lower number to assess LPC Waller's opinions.  (*Id.*) It is well established, however, that these sorts of factual errors do not entitle a plaintiff to remand unless he shows that the error was not harmless.

The case of *Howarth v. Berryhill* explains this point in a factual setting not unlike the one present here.  In *Howarth*, an ALJ misread a medical record of "very brittle bipolar disorder" as "very little bipolar disorder."  No. 3:16-cv-1844 (JCH), 2017 WL 6527432, at *16 (D. Conn. Dec. 21, 2017).  Judge Hall noted that "[w]hen an ALJ misreads the record, in some cases remand may

be appropriate." *Id.* (citing *Rivera v. Astrue*, No. 10-cv-4324 (RJD), 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012)). "However, courts in other instances have held the error to be harmless if the ultimate determination is nonetheless supported by substantial evidence." *Id.* (citing *Trombley v. Colvin*, No. 8:15-cv-00567 (TWD), 2016 WL 5394723, at *4 n.6 (N.D.N.Y. Sept. 27, 2016) and *Coates v. Colvin*, No. 5:12-cv-1340 (GLS), 2013 WL 3148222, at *4 (N.D.N.Y. June 19, 2013)). Although "very little bipolar disorder" and "very brittle bipolar disorder" would have led to "different interpretations of [the claimant's] condition," "the error was harmless because the ALJ's RFC analysis was supported by substantial evidence that included [the claimant's] own statements, the treatment notes of his healthcare providers, [and] the other medical opinions in the record." *Id.*

In this case, the Plaintiff has not shown how the difference between five visits and eleven visits would or could change the analysis, and by extension he has not shown that the error was harmful.[4]  However many individual therapy sessions he attended, the fact remains that LPC Waller did not observe him in that setting; she only observed him in groups.  (*See, e.g.,* R. 498, 511, 579, 633, 668, 690, 739, 753.)  She therefore had no first-hand observations about his behavior, emotional stability, and ability to focus outside the group context.  Whether the correct number of visits was five or eleven, the ALJ was entitled to assign a lower level of persuasiveness to her opinions about the Plaintiff's ability to work in settings that differed from the one she had directly observed.

---

[4]    The Plaintiff does make a harmful-error argument about the ALJ's larger decision not to accept LPC Waller's marked limitation finding.  (Pl.'s Memo. at 12-13.)  Because the Court holds that the ALJ did not commit legal error in rejecting that finding, it does not need to address whether that error was harmful or harmless.

The Plaintiff next faults the ALJ for observing a "broad" space between "mild" and "marked" limitations (Pl.'s Memo. at 10), but this claim is similarly unpersuasive. He interprets the ALJ as having accused LPC Waller of using these terms in an ambiguous way, or in a way that is out of sync with SSA regulations. (*Id.*) But the Court does not read the ALJ's opinion that way. Rather, the ALJ appears only to have been saying that, although he thought the Plaintiff merited a higher level of limitation than the "mild" limitations assigned by Drs. Leveille and Rogers, that did not necessarily mean he merited the "marked" limitations observed by LPC Waller – because between "mild" and "marked" there is "moderate," and a "moderate rating represents a broad spectrum of functioning." (R. 29.) In other words, the ALJ concluded that there is a broad spectrum of "moderate" between mild and "marked," and the Plaintiff fell somewhere along that broad spectrum. In this appeal, the Plaintiff does not explain why or how the ALJ committed legal error in reaching this conclusion, and indeed the available authorities are to the contrary. *See, e.g., Rebecca S.L. v. Comm'r of Soc. Sec.*, No. 5:21-cv-1212 (TJM) (DEP), 2022 WL 19073804, at *9 (N.D.N.Y. Dec. 7, 2022) (citing the SSA's Program Operations Manual System for the proposition that a "moderate limitation" "covers a broad range of possible levels of limitation"), *report and recommendation adopted sub nom. Rebecca L. v. Comm'r of Soc. Sec.*, No. 5:21-cv-1212 (TJM), 2023 WL 2537625, at *1 (N.D.N.Y. Mar. 16, 2023); *see also* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, § 12.00F2 (defining "moderate limitation" as meaning that the claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair").

The Plaintiff's third objection arises out of the ALJ's citation to "negative findings" (Pl.'s Memo. at 11), but this objection is similarly unavailing. To be sure, "[i]t is in the nature of mental illness that claimants will often have good days as well as bad days – or, as the Second Circuit put it, that there will ordinarily be 'longitudinal inconsistencies' in the claimant's mental health

record[.]'" *Diana P. v. Kijakazi*, No. 3:20-cv-837 (TOF), 2021 WL 4305005, at *7 (D. Conn. Sept. 22, 2021) (quoting *Estrella*, 925 F.3d at 97). Thus, it can sometimes be reversible error for an ALJ to focus exclusively on the claimant's "good days," and to entirely ignore his "bad days" – or, to use the Plaintiff's terminology, to focus exclusively on "negative findings" and to entirely ignore "positive findings" – when assessing how much weight to assign to a medical source opinion. *Id.* (holding, in a case under the former "treating physician rule," that the plaintiff was entitled to remand because the record did not demonstrate that the ALJ "considered the 'bad days'"). But that is not what happened here. While the ALJ did cite the "good days" or "negative findings," his opinion also contains abundant citations to the "bad days" or "positive findings." In particular, he cited the "difficulty" the Plaintiff had "in the group sessions" (R. 29); the problems he reported in "following instructions, needing things repeated, and with memory" (R. 21); his occasional displays of "delayed cognition and/or memory and/or a circumstantial thought process" (*id.*); his "withdrawing from others, anxiety, nervousness, negative thoughts about self and others around him, and difficulty getting along with others" (*id.*); and his occasional "constricted, flat, anxious, irritable, or labile affect" and "dysthymic, dysphoric, sad, anxious, or irritable mood[.]" (*Id.*) Where, as here, the ALJ considers both the good and the bad, his weighing of the evidence is entitled to deference from the Court. *See Sheila Renee H.*, 2022 WL 4181723, at *7-8 (deferring to an ALJ's weighing of the "bad as well as the good" in mental status examination reports).

Fourth, the Plaintiff questions the ALJ's focus on the distinction between group and individual tasks. (Pl.'s Memo. at 11-12.) The ALJ observed "no evidence that vocationally [the Plaintiff] would have difficulty in performing simple tasks with no tandem or group tasks required[.]" (R. 29.) The Plaintiff responds that "[i]t is not clear why this would be the case," in light of the twin facts that "(i) [his] interaction in group therapy was not comparable to tandem

tasks," and "(ii) [he] testified that he socially struggled with work that was not a tandem or group task" when he tried unsuccessfully to return to the practice of law.  (Pl.'s Memo. at 11-12.)  But neither of these facts constitute a persuasive basis for remand.  With respect to the first point, it is well established that Social Security claimants bear the burden to prove an RFC that is more restrictive than the one the ALJ found.  *E.g., Smith v. Berryhill*, 740 F. App'x 721, 726 (2d Cir. 2018) (summary order) ("[The claimant] had a duty to prove a more restrictive RFC, and failed to do so."); *Peter F. v. Dudek*, No. 3:24-cv-1275 (TOF), 2025 WL 762666, at *7 (D. Conn. Mar. 11, 2025) ("[T]he plaintiff has the burden to prove a more restrictive RFC than the ALJ found." (citation omitted)).  Here, the ALJ found that the Plaintiff retained the functional capacity to perform non-complex, non-group, non-tandem tasks, and it was the Plaintiff's burden to show that he did not.  The fact that his interactions in group therapy did not test that ability one way or the other does not carry his burden.  And with respect to the second point, the ALJ did note the Plaintiff's testimony about his attempt to reenter law practice, and how it failed "due to the severity of [his] inability to focus."  (R. 28.)  But he also found that "the claimant's statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely consistent with the medical evidence and other evidence in the record" (R. 24), and he identified concentration and ability to follow logical thought processes as areas in which the medical record supported a lower level of limitation than the Plaintiff had testified to.  (R. 26.)  Provided that the ALJ follows the process set forth in 20 C.F.R. § 416.929(c) – and the Plaintiff does not claim that he did otherwise – his conclusions about the credibility of a claimant's testimony relative to the objective medical and other evidence should not be disturbed by a federal district court.

Fifth and finally, the Plaintiff argues that the ALJ's evaluation of the Waller opinions should not have drawn any support from the Leveille and Rogers opinions.  (Pl.'s Memo. at 13.)

He notes that "[t]he ALJ found completely different [psychiatric review technique] findings and severe impairment findings in his decision than [Drs. Leveille and Rogers] did in their reports" (*id.*), and that is true enough.  (*Compare* R. 21-22 *with* R. 63, 70.)  But he cites no authority for the proposition that, where a state agency consultant identifies a mild limitation but an ALJ upgrades it to a moderate limitation, the ALJ cannot consider the consultant's view in assessing the weight to be assigned to a treating source's marked limitation opinion.  Indeed, the relevant regulation affirmatively directed the ALJ to consider the degree to which the Waller opinion was consistent with "evidence from other medical sources," 20 C.F.R. § 416.920c(c)(2), and the Leveille and Rogers opinions are "evidence from other medical sources."

In summary, the ALJ adequately discussed the supportability and consistency of LPC Waller's opinions.  Each of the Plaintiff's attacks on the ALJ's handling of those opinions is unavailing, and the Court is therefore constrained to affirm his decision.  *See Veino*, 312 F.3d at 586.

## IV.   CONCLUSION

For the foregoing reasons, the Court concludes that the ALJ did not commit legal error in his handling of the Waller opinions, and that his decision was supported by substantial evidence. The Plaintiff's Motion to Reverse or Remand the Commissioner's Decision (ECF No. 17) is therefore **DENIED**, and the Defendant's Motion for an Order Affirming the Decision of the Commissioner (ECF No. 23) is **GRANTED**.

This is not a recommended ruling.  The parties consented to the jurisdiction of the undersigned Magistrate Judge, who may therefore direct the entry of a judgment of the district court in accordance with the Federal Rules of Civil Procedure.  (ECF No. 10.)  Appeals may be made directly to the appropriate United States Court of Appeals.  *See* 28 U.S.C. § 636(c)(3); Fed.

R. Civ. P 73(c).  The Clerk of the Court is respectfully directed to enter judgment in favor of the Plaintiff, and to close the case.

So ordered at Hartford, Connecticut this 17th day of September, 2025.


*/s/ Thomas O. Farrish*
Hon. Thomas O. Farrish
United States Magistrate Judge